1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION

3                          - - -

4    UNITED STATES OF AMERICA,   .  Case No. 1:12-cr-043
                                 .
5              Plaintiff,        .
                                 .  *Sentencing*
6            - v -               .
                                 .
7    TRACY BIAS,                 .  Wednesday, May 21, 2014
                                 .  Cincinnati, Ohio
8            Defendant.          .
     . . . . . . . . . . . . .   .  9:35 a.m.
9

10                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE MICHAEL R. BARRETT
11

12   For the Plaintiff:    TIMOTHY D. OAKLEY, ESQ. (AUSA)
                           United States Attorney's Office
13                         221 East Fourth Street, Suite 400
                           Cincinnati, Ohio  45202
14

15   For the Defendant     JOHN T. KELLER, ESQ.
                           2345 Kemper Lane
16                         P.O. Box 6129
                           Cincinnati, Ohio  45206
17
                           PETER COLIN LINK, ESQ.
18                         810 Sycamore Street, Fifth Floor
                           Cincinnati, Ohio  45202
19
     Also present:         Agent Christopher Kresnak, DEA
20                         Agent Brian Carroll, FBI
                           Keith Manfra, U.S. Pretrial Services
21
     Law Clerk:            Lindsay Potrafke, Esq.
22
     Courtroom Deputy:     Barbara A. Crum
23
     Court Reporter:       Maryann T. Maffia, RDR
24                         239 Potter Stewart U.S. Courthouse
                           100 E. Fifth Street
25                         Cincinnati, Ohio 45202

1          P R O C E E D I N G S

2          COURTROOM DEPUTY:  On the docket this morning is

3  District Court Case Number 1:12-CR-43, Defendant 1:  *United*

4  *States of America versus Tracy Bias*.

5      We're here this morning for sentencing.

6          THE COURT:  All right.  Counsel want to enter their

7  appearances for the record, please.

8          MR. OAKLEY:  Good morning, Your Honor.  Tim Oakley

9  for the United States.

10          MR. KELLER:  John Keller on behalf of Mr. Bias.

11          MR. LINK:  Peter Link, also on behalf of Mr. Bias.

12          THE COURT:  Okay.  You guys, if you want to work from

13  the table, that's fine as long as you stay close to a

14  microphone.  Otherwise, you can stay at the podium, wherever

15  you're most comfortable.

16      You guys want to work from the table?  Okay, that's good.

17      Okay.  Let's just recap.  It was almost a year ago, I

18  guess, on June 7th, 2013, Mr. Bias appeared in front of me.

19  He entered a plea of guilty to Conspiracy to Distribute and

20  Dispense a Controlled Substance, which was the first count of

21  the Superseding Indictment.  There was a Plea Agreement.

22  We'll talk a little bit more about that when we get to that

23  stage of the proceeding.  The case was referred to the

24  Probation Department for a PSI.  It was originally cut on

25  August 26th of last year and revised in the fall.  I have

1    received the government's Sentencing Memorandum as well as the

2    defendant's Sentencing Memorandum.

3        So Tim, have you received a copy of -- well, obviously you

4    have yours, but did you receive a copy of defendant's

5    memorandum and the PSI?

6            MR. OAKLEY:  Your Honor, I've received a copy of the

7    PSI and the objections contained within.  I'm not sure that I

8    have received a separate Sentencing Memorandum.

9            THE COURT:  It was Document 229.

10           MR. OAKLEY:  We're prepared to proceed regardless.

11           THE COURT:  All right.

12       Counsel, you guys have received everything, correct, and

13   discussed it with Mr. Bias?

14           MR. LINK:  Yes, Your Honor.

15           MR. KELLER:  Yes, Your Honor.

16           THE COURT:  All right.  And I also have an updated, I

17   guess dated May 15th, an updated health situation on Mr. Bias

18   regarding his high blood pressure and his neck and back pain

19   and that bit.  We can talk about that at the appropriate time.

20   Is that all right?

21           MR. LINK:  Yes.

22           THE COURT:  Okay, good.  So the officer that wrote

23   the report used the 2010 edition of the Guidelines Manual.

24   As we go through, if you guys have objections, let's just run

25   through them at the time.

1       But in any event, a violation of 21 U.S.C. 841(a) is

2   governed by Guideline 2D1.1.  And we all know the way you use

3   that is you use the Drug Quantity Table to find out the amount

4   of drugs involved in this case.  The agents in this case

5   provided extensive information on the amount of medication

6   provided, so we think he is Offense Level 38 according to the

7   probation officer.

8       All right.  And then we have the injury that occurred

9   November 4, 2009.  William Adams became a patient at the

10  Portsmouth clinic, started on OxyContin.  He died November 5th

11  after consuming a portion of the OxyContin that was

12  prescribed.  Mr. Bias denies any causation between his

13  behavior and Mr. Adams' death.

14      He's still a 38.  Then we have adjustment for role in the

15  offense.  He was clearly an organizer.  Mr. Bias and

16  Mr. Journey managed this operation, devised the scheme, so

17  there was a two-level adjustment that was considered by the

18  probation officer, and the added adjusted offense level

19  becomes a 40.

20      Then you have acceptance of responsibility by entering the

21  plea, which is a negative 2; and then the timely fashion,

22  which he did, got another point off.  So he ends up at a 37.

23      His Criminal History would put him at a category of a

24  Roman numeral II.

25      So at the end of day he would have an offense level

1    calculation of 37, a Criminal History of II, which would give

2    him a guidelines provision of up to 235 to 240 months.  The

3    Probation Department in this case has recommended a 235-month

4    sentence.  Supervised release is three years to life.  They

5    recommended three years.  He is not eligible for probation.

6         A fine we can discuss later.  It could be up to a million

7    dollars, but I'll talk to defense counsel about that.  And

8    there is also a one-hundred-dollar special assessment.

9         There was the Plea Agreement in this case which talked

10   about sentencing limitations, which we'll get to when we're

11   ready.

12        As to the actual calculation itself, based on his criminal

13   history, the amount of narcotics involved in this case, are

14   there any objections to that calculation?

15             MR. LINK:  Yes, there are, Your Honor.

16             THE COURT:  All right.  Let's run through them.

17             MR. LINK:  Although an enhancement hasn't been placed

18   in the assessment for that purpose, we object to the inclusion

19   of Mr. Adams and facts pertaining to Mr. Adams in that

20   investigation or in the sentencing.  The law is pretty clear

21   that unless facts regarding a death are admitted to or proven

22   to a jury, that they cannot be considered by the Court in

23   sentencing.  So I'd like to put that out there.

24        Now, that -- it really makes not much of a difference as

25   they are calculating the 38 Base Offense Level based on the

1    quantity of drugs involved, but I would like to, again, put

2    that on the record that the alleged death is not proper for

3    the Court to consider at this time.

4            THE COURT:  Tim?

5            MR. OAKLEY:  Your Honor, with all due respect, I

6    think it's a misstatement of the facts and the law.  If we're

7    talking about *Apprendi,* I would agree that it would need to be

8    proven, but this doesn't change either the mandatory minimum,

9    the maximum potential under the law, or it doesn't affect the

10   Guidelines whatsoever.  What it is is, it's stated in there

11   that he died.  There is no dispute that he died, there's no

12   dispute, I don't think, that he died of a drug overdose; but

13   it was not used to enhance his guideline sentencing in any

14   fashion.  What it does show, as we said in our memorandum,

15   it's just another example of the damage that these pills were

16   causing to the community.  If anything, it may be a factor the

17   Court can consider in the 3553.

18       The Court can consider any factor it wants under 3553,

19   including acquitted conduct.  But again, Your Honor, I don't

20   believe that it's really an objection that needs to be ruled

21   upon by the Court; but if it is, it should be denied.

22           THE COURT:  Yeah.  I mean, I'm not sure it comes

23   under the category of a clear objection anyway.

24       But Tim, just in terms of the sentencing in this case and,

25   counsel, in terms of the sentencing, I think the width and

1    breadth of this conspiracy was large enough that, in arriving

2    at eventual sentence in this case, I am not going to take the

3    actual death into consideration.  I don't think that's

4    necessary for me to get where I am going to end up, in all

5    likelihood, after reading the PSI and both sets of memorandum.

6        So for the Court of Appeals purposes, I am not going to

7    consider that as part of a sentencing enhancement.

8            MR. LINK:  There is one other issue, Your Honor.

9            THE COURT:  Go ahead.

10           MR. LINK:  Now, the presentence investigation clearly

11   states that the Plea Agreement had no impact on the

12   recommended range.  However, I would point out to the Court --

13           THE COURT:  Could I ask one question?  Was the Plea

14   Agreement sealed?

15           MR. OAKLEY:  I believe it was.

16           THE COURT:  Well, so are we --

17           MR. OAKLEY:  We'd move to unseal it, Your Honor.

18           THE COURT:  Do you have an objection to the Plea

19   Agreement being unsealed?  Otherwise, I'm going to ask some

20   people to leave.

21           MR. LINK:  We have no objection.

22           MR. OAKLEY:  And it may have been unsealed at the

23   trial of Steven Hillman also.

24           THE COURT:  Barb says it was, so it's already been

25   unsealed.  Okay.  That's all right.

1          I'm sorry.  Go ahead.

2               MR. LINK:  The presentence investigation report says

3     that the Plea Agreement itself has no impact on the

4     calculation.  However, at the time this Court accepted

5     Mr. Bias plea on June 7th of last year, there was a discourse

6     that was had.  In that plea colloquy, it was explained to

7     Mr. Bias that the offense level would be a 37; and that after

8     applying the three-point reduction for continued acceptance of

9     responsibility, which has been applied in this case, that the

10    offense level would be reduced to a 34.

11         We would ask that the Court honor that as that was what

12    was represented in open court and that is the understanding

13    that Mr. Bias had in entering into his plea.

14              THE COURT:  Okay.  Hang on one second.  I do have a

15    copy of one part of the transcript, but I don't believe -- all

16    I have is the part where it's filed under seal.  Hang on one

17    second.

18              MR. LINK:  We are talking at pages 13 and 14, Your

19    Honor, beginning at line 15.

20              THE COURT:  Yeah, I'm not -- that's what I'm saying,

21    counsel.  I don't have those.  I've just got the earlier

22    part.

23         Looking in the Plea Agreement, where do we talk about the

24    calculation where it would have led to a 34?

25              MR. OAKLEY:  It's paragraph 3, Your Honor, that the

1  defendant understands that the United States believes the

2  level is a 37.  He also understands that they are advisory and

3  not mandatory.

4      Continuing one with paragraph 3, the Court is required to

5  consider them but not required to follow them.  It may impose

6  a sentence higher or lower based on the applicable range of

7  the Federal Sentencing Guidelines of the offense under the

8  Indictment.

9      He has reviewed it and understands how they may apply to

10 this case but does not bind the Court.

11          THE COURT:  Okay.  Got it.  If it was a 34, it would

12 be a 168 to 210?  Is that right?  Okay.

13     What about the -- you want to talk about the -- discuss

14 the cap in the Plea Agreement?

15          MR. LINK:  Yes, Your Honor, if we could.

16     Now, as to that cap, as the Court knows, this case was

17 only resolved by a plea, but that plea was only reached after

18 Mr. Bias was able to reach an agreement with the government

19 and an understanding with this Court.  As we've already noted,

20 the Court represented to Mr. Bias that the level would be a 34

21 with the three-point reduction for acceptance of

22 responsibility, but --

23          THE COURT:  Well, I think as Mr. Oakley points out, I

24 don't think "represented" would have been the word.  It would

25 have been suggested.

1    MR. LINK:  It was asked if Mr. Bias understood that

2 to be the case, and he said yes.

3    THE COURT:  Right.  I also asked him if he understood

4 that everything was subject --

5    MR. LINK:  Not binding on the Court, yes.

6    THE COURT:  Yeah.

7    MR. LINK:  Yes.  That was fully explained to Mr. Bias

8 at the time.

9    THE COURT:  Okay.

10    MR. LINK:  Your Honor, first of all, this plea was

11 only reached after the Statement of Facts was amended to omit

12 any allegations that Mr. Bias owned Trinity Health Care or

13 that Mr. Bias sponsored patients to this clinic or any of the

14 clinics involved.  After that had been amended and after that

15 Amended Statement of Facts was accepted by the government, the

16 government agreed that it would seek a sentence of no more

17 than ten years if Mr. Bias cooperated, but also agreed that if

18 Mr. Bias did not cooperate, that it would move to withdraw his

19 plea.  And that's at paragraph 5 of the Plea Agreement, I

20 believe.

21    In this case, nobody is contesting that Mr. Bias

22 shouldn't get the three-level reduction for acceptance of

23 responsibility, but the government's position is now that the

24 sentencing level should be a 37 after the three-point

25 reduction.  And even though nobody is arguing that Mr. Bias

1   shouldn't get the reduction for acceptance of responsibility,

2   the government's position is now that he didn't cooperate.

3       The government is primarily basing these claims that he

4   didn't cooperate on -- because Mr. Bias still won't admit that

5   he owns Trinity Health Care and because he discussed an

6   earlier version of the Statement of Facts with his former

7   attorney, Steve Hillman.

8       As to the fist of these claims, Your Honor, Mr. Bias --

9           THE COURT:  What is the timing of that discussion?

10  Was Hillman still representing him or was it post-Hillman's --

11          MR. LINK:  At that time he was still representing him

12  in the civil forfeiture action, which was surrendered as --

13          THE COURT:  Well, I think he fired him in open court,

14  didn't he, if I remember?

15          MR. OAKLEY:  He moved -- well, what happened --

16          THE COURT:  Hillman didn't --

17          MR. OAKLEY:  Hillman had filed a civil action to

18  recover property on his own that was not authorized by

19  Mr. Bias.

20          THE COURT:  Right.  And Mr. Bias confirmed that?

21          MR. OAKLEY:  Mr. Bias confirmed.  But at that same

22  time, Mr. Bias had two defense counsel:  Mr. Link and

23  Mr. Keller.  Mr. Hillman was not representing Mr. Bias in the

24  criminal.

25          MR. LINK:  That is true, Your Honor.  And not only

1  that, Your Honor, but Mr. Keller and I did advise Mr. Bias

2  throughout the course of this to have no further contact with

3  Steve Hillman.  However --

4  THE COURT:  Well, back up.  Help me clarify.  What's

5  the timing of that conversation, as you understand it, versus

6  the timing of signing off on the Plea Agreement?

7  MR. LINK:  It was before and well before that point.

8  What was shared with Mr. Hillman was an initial proposed

9  Statement of Facts.  There was some back-and-forth between the

10  United States Government and defense counsel as to amending

11  that Statement of Facts and finally reach an agreement by

12  which a plea could be had.

13  And so prior not only to signing the agreement, but prior

14  to arriving at the Statement of Facts, which was eventually

15  signed by Mr. Bias, Mr. Bias shared that earlier proposed

16  Statement of Facts with Mr. Hillman.

17  THE COURT:  Okay.

18  MR. LINK:  Now, as to the allegations that there was

19  some secret meeting, some type of clandestine operation, Your

20  Honor, I would suggest to the Court this was two co-defendants

21  discussing a case that they were both in, and that discussion

22  happened before any agreement was reached with the government.

23  Now, a Plea Agreement, like all Plea Agreements, is

24  basically a contract, Your Honor; and like all contracts,

25  there is an implied duty of good faith that goes along with

that agreement.  It would be hard to imagine a scenario where, in good faith, the United States Government could say that, by signing that agreement, Mr. Bias retroactively agreed to be cooperative in the past.

As to the second claim, Your Honor, that Mr. Bias still won't admit his ownership in Trinity, again, he has denied that all along.  The government knew that he would deny that at the time that he signed the plea, and that language was removed from the Statement of Facts for that reason.

The government met with him, agreed to accept his plea, and was only able to get the plea as a result of agreeing to take that language out.  So now it's hard to see how, again in good faith, the government could claim that he hasn't cooperated with them because he continues to deny what he denied all along.

The government knew these facts the whole time for the last almost year since it's accepted his plea, and the government could have said -- knowing that Mr. Bias would deny these things, it could have said, "You're a liar, Mr. Bias. We don't believe you, and we're not going to accept your plea. You're going to trial."  And they could have filed a motion to withdraw as required by the Plea Agreement, but they did not.

Instead, they let him waive his constitutional rights. They had him agree to the forfeiture of certain property. They had him meet with the government and its agents on

1   multiple occasions, finally had him testify at trial.

2       Now, frankly, Your Honor, that -- it can't -- that egg

3   can't be unscrambled.  They accepted his plea knowing these

4   facts, and we are here today in good faith seeking good faith,

5   and we're essentially asking for what was agreed to in that

6   Plea Agreement.

7           THE COURT:  Do you have anything else on that issue?

8           MR. LINK:  Um, I could go on at length, Your Honor,

9   but I don't want to waste the Court's time as to this.  I will

10  say for the record that at the time we were negotiating a plea

11  with the government, it was represented to defense counsel

12  that co-defendant Tracy Bias was going to be getting a

13  substantially larger sentence than what Mr. Bias and what was

14  contemplated in this Plea Agreement for Mr. Bias --

15          MR. KELLER:  Not Tracy.  Bart.

16          MR. LINK:  Oh, I'm sorry.  Yes.  Mr. Journey was

17  going to be given a substantially larger sentence than

18  actually what was contemplated by Mr. Bias' Plea Agreement.

19  Although we were not allowed to share the specific numbers of

20  the sentence that was represented to us with Mr. Bias, that

21  certainly went into part of our calculation as defense

22  attorneys in recommending that Mr. Bias take this plea.

23      Needless to say, we were surprised to find that

24  Mr. Journey had recently been sentenced to five years in this

25  court on the same offense levels with nearly identical

1    conduct.

2        Now, as much as the government wants to make Mr. Bias out

3    to be a criminal mastermind in this, Your Honor, this is a

4    business model that was learned and known by Bart Journey as a

5    result of working with his brother, Michael Journey, since as

6    early as 2004.  This is a business model that Mr. Journey

7    pitched to his neighbor, Mr. Bias, and that Mr. Bias accepted.

8    What was supposed to happen is that Mr. Bias was going to run

9    one clinic while Mr. Journey ran the other, and they were

10   going to split the profit 50/50.

11       And I would point out to the Court that while Mr. Bias is

12   on tape saying that he would be satisfied with 12 patients a

13   day at his clinic, it was actually Mr. Journey who was making

14   money on the side by sponsoring patients to those clinics.  It

15   was Mr. Journey who, when he got caught, basically flipped and

16   pled out.  Mr. Journey has purportedly admitted his

17   wrongdoing, and he has cooperated with the government and,

18   with the same sentence guidelines, was sentenced to five

19   years.

20       Now, Mr. Bias has admitted his wrongdoing.  He has

21   cooperated with the government.  He, too, met with

22   government's agents, testified at trial, and the government is

23   trying to give him a sentence that's four times that of

24   Mr. Journey's.

25       We're requesting a sentence that is more like that

1  contemplated by the Plea Agreement, a sentence of no more than

2  ten years, which, I would point out, is twice that of what was

3  given to Bart Journey.

4       THE COURT:  Let's -- before I ask Mr. Oakley to

5  speak, I mean, I think the key provisions I'll ask you guys to

6  agree or disagree, but paragraph 6 indicates that if the

7  government determines he has not complied with the terms of

8  the agreement, they may move for sentencing enhancements --

9  I'm paraphrasing now -- which may have been in the PSI, which

10  they have done through their Sentencing Memorandum.

11     The seventh paragraph is little bit more subjective.  It

12  requires complete and honest testimony.

13     And then in paragraph 16, the defendant acknowledges that

14  after my full understanding of all the facts and

15  circumstances, I could review the offense factors that are

16  previously outlined, and if I determine them not appropriate,

17  I am not obligated to accept such.  At that point, he has no

18  right to withdraw his plea.

19     So we've got all of that swirling around, so I'll as ask

20  Mr. Oakley for his comments on this.

21       MR. OAKLEY:  Thank you, Your Honor.  First, I'm not

22  sure that what I heard was an objection, a proper objection,

23  but more of a mitigation.  We don't believe it was a proper

24  objection, if that's what was the case.

25     To discuss now, if the Court wants, the Plea Agreement or

1    the cooperation, I'll be glad to do that.

2          THE COURT:  Can I ask one question?  I don't have a

3    copy of the plea transcript in front of me.  Oftentimes, if

4    there is a contemplated agreed-upon sentence I will make some

5    comments regarding that.  Did I make such comments in this

6    case?

7          MR. OAKLEY:  It was not an agreed-upon sentence, Your

8    Honor.

9          THE COURT:  Okay.  Okay.

10         MR. LINK:  You did, Your Honor.

11         THE COURT:  And what did I say?

12         MR. LINK:  Hold on, just a moment here.

13       This is the Court speaking:

14       "A couple of things that go into the mix on that.  The

15   Plea Agreement contemplates that you guys are agreeing the

16   appropriate guideline level is 37.  That means something to

17   you and your lawyer, and I'm sure he has explained what that

18   means.  There is also a provision in there where the

19   government has indicated that because you entered the plea,

20   you should get two levels off that for acceptance of

21   responsibility.  If that cooperation continues through the

22   time of the sentencing, there would be another level taken

23   off, which would take you down to a 34."

24       Hold on just a second.  And I'm trying to find the exact

25   place where they speak about the ten-year cap.

```
 1              THE COURT:  That's what I was curious.
 2              MR. OAKLEY:  It would have been in the plea colloquy,
 3    Your Honor.
 4              THE COURT:  Right.  I mean, I would have had a
 5    discussion.
 6              MR. OAKLEY:  Yes, sir.
 7              MR. LINK:  I apologize, Your Honor.
 8              THE COURT:  That's okay.
 9              (Pause in proceedings.)
10              MR. LINK:  It's right above that on page 14, I'm
11    sorry, Your Honor, beginning at line 2.
12         "They've" -- referring to the government -- "also
13    indicated that if they seek your cooperation in this matter
14    and you provide honest and truthful testimony" -- and I would
15    point out that Mr. Bias testified at trial -- "they will not
16    look for a sentence of more than ten years."
17         I'd also direct the Court's attention to paragraph --
18              THE COURT:  So my question on that -- I mean, you
19    guys have had pleas with me before.  I sometimes focus in a
20    little bit more on that, but it seems like I clearly caption
21    that in terms of the truthful and honest testimony at this
22    point, and I didn't make any promises to Mr. Bias where he
23    would end up.
24              MR. LINK:  That is correct.
25              THE COURT:  Do you agree with that?
```

```
 1              MR. OAKLEY:  Yes, sir.

 2              THE COURT:  All right.

 3              MR. LINK:  Your Honor, I would point to paragraph 5

 4    of Plea Agreement, though, which sets this agreement apart

 5    from others.  This isn't simply a circumstance where the

 6    government has agreed to ask for more than ten years if it

 7    found Mr. Bias didn't cooperate.

 8         At paragraph five, it says, "In the event that the

 9    defendant fails to provide complete cooperation as determined

10    by the United States, the defendant and the United States

11    understand and agree that the defendant has violated the terms

12    of this agreement.  The defendant further understands that the

13    United States will move that the plea and plea offer be

14    withdrawn and the defendant will face the charges as set forth

15    in the entire Indictment."

16         Now, that reading means, Your Honor, that the government

17    has agreed to either move to withdraw this plea if it found

18    Mr. Bias didn't cooperate or it requests a sentence of no more

19    than ten years if determine he did --

20              THE COURT:  How do you reconcile that with paragraph

21    6 that says that if they make a determination that he has not

22    complied with the terms of the Plea Agreement, they may move

23    to avoid the enforcement of the Plea Agreement and they may

24    use the sentencing enhancements?  That seems to be what he has

25    done in the Sentencing Memorandum.
```

1          MR. LINK:  I would read that as a conjunctive with

2    paragraph 5, so that they wouldn't require under the Plea

3    Agreement to move to withdraw the Plea Agreement, and then

4    they also may apply for sentencing enhancements that may be

5    applicable in the case.

6          Here we have a Plea Agreement, and they've basically moved

7    for all the enhancements that can be made.  The Probation

8    Department's made all the enhancements that can be made.  And,

9    most importantly, no motion was filed.

10         I mean, it was -- as we've already said, Your Honor,

11   Mr. Bias' statements and story hasn't changed since a year ago

12   prior to entering this Plea Agreement.  It's been consistent

13   with the Statement of Facts that was agreed to by Mr. Bias and

14   the United States.  The government could have at any time

15   said, "We don't believe you, and we're withdrawing.  We are

16   moving to withdraw your plea.  You are back to square one."

17         But it didn't.  Instead, they continued to work with him

18   and continued to meet with him, and ultimately asked him,

19   called him to testify, required him to testify in open court

20   in a federal trial, and he did.

21         The motion was never filed prior to that, and it's too

22   late to file that motion now, Your Honor, under the terms of

23   the Plea Agreement, which, again, is read like a contract.

24   They were required to do one or the other.

25              THE COURT:  Mr. Oakley.

1              MR. OAKLEY:  First of all, Your Honor, I would like

2    to complete paragraph 5.  It starts with he understands that

3    the United States will be the sole determiner of whether or

4    not he has truthfully complied with his obligation to

5    cooperate as set forth in the plea.  The United States retains

6    the right to be the sole determiner as to whether or not

7    Mr. Bias has told us the truth and fully cooperated.

8         I guess the -- you know, we're now left with a request to

9    either withdraw the guilty plea and proceed to trial on all

10   charges or just simply let this case go and receive a

11   substantial sentence and not waste the Court's time.

12        We take exception to a couple of other things that was

13   said.  We did not seek any enhancements that were not -- we

14   did not seek all the enhancements.  He was clearly the

15   leader/organizer.  We didn't seek enhancement for the death.

16   We didn't seek enhancement for the causing of injury to other

17   patients.  We have done that in the past, Your Honor.  We have

18   done that in other cases.

19        So to claim that we have misrepresented anything, quite

20   frankly, is just not accurate, and we would take exception.

21        What we would tell the Court is that while the United

22   States was negotiating in good faith, I find it ironic to be

23   blamed for not being in good faith when the person who was

24   surreptitiously meeting with a co-defendant, Steven Hillman,

25   was Tracy Bias.  They were going through what was a sealed

1    Statement of Facts and changing it to remove parts that

2    involved Steven Hillman's involvement in the clinic.  That's

3    what was going on.

4        And I have to give Mr. Keller and Mr. Link credit.  They

5    didn't know it either.  They told us afterwards.  There were

6    several drafts of the Plea Agreement made.  The first removed

7    the Trinity ownership.  The Court heard the trial that

8    ownership was -- the denial of ownership was bizarre, to say

9    the least.  There was testimony he would be sent and he --

10   Mr. Bias would be going up and visiting the clinic on a daily

11   basis or close to a daily basis.  They were checking the

12   receipts.  He had asked Dr. Lassiter to get information on the

13   patients so that he can keep track of what was going on.

14       And then after that was removed, after the meeting of

15   Mr. Hillman and Mr. Bias, the part about John Dahlsten's DEA

16   registration number was removed at the time of the plea, that

17   was the second change.  This was after another meeting with

18   Mr. Hillman, which, again, no one here knew.

19       The United States was acting in good faith.  I believe

20   Mr. Link and Mr. Keller were acting in good faith.  Mr. Bias

21   was not.

22          THE COURT:  What's your assessment of -- you and the

23   agents' assessment of his testimony at trial?

24          MR. OAKLEY:  We found a lot of it to be confusing,

25   contradicted by other evidence, especially knowing that it was

1  changed after meeting with Mr. Hillman.  We had reservations

2  about it.  I don't know what was true and what was not.  I

3  know that the only people that were not surprised by some of

4  the testimony was Mr. Bias and Mr. Hillman.

5          THE COURT:  Tim, I don't want to go too deeply into

6  this, but did Mr. Bias proffer anything before he met with

7  Mr. Hillman, or how did all that work?

8          MR. OAKLEY:  We had talked, and then we talked after

9  the change of plea.  Admittedly, it got rather heated as to

10 what we were hearing.  We finally -- we had been trying to put

11 together why it was changed.  We met before.  And after we

12 found out that there had been these meetings, it was changed.

13 We confronted Mr. Bias, and he just simply did not make sense.

14         THE COURT:  Did he ever fess up to these meetings?

15         MR. OAKLEY:  No, no.  I would say in proffers he did

16 admit to sponsoring patients before.  They were going to

17 Florida to see the doctor, and that's where they came up with

18 the idea of going to Portsmouth and open up their clinic.

19     I guess if we segue into that, because of a number of

20 things that were said, this was a clinic that was opened up

21 late in the pill game.  This was opened up in '09 or

22 thereabouts.  By then, we had already had multiple clinics

23 investigated, prosecuted, searched.  This was not, you know,

24 at the request of Bart Journey.  This was an active, ongoing

25 conspiracy with Mr. Bias at the helm also.

1    You know, they got tired of going to Florida because of

2  the travel.  Mr. Bias had a Florida driver's license.  They

3  came up here to sell pills to people.  That's what happened.

4  And then Mr. Hillman, he just simply changed his story in

5  secret meetings.

6    The good faith was with the United States, at least at the

7  time of the plea, or the good faith was with the United

8  States, period, in trying to get to the bottom of this.  To

9  claim that we are not acting in good faith, I think, is

10  ironic, as the only person who acted in bad faith was Mr. Bias

11  with meeting in secret with Mr. Hillman.

12    I can go on, Your Honor, but I'm not sure that --

13         THE COURT:  No.  I mean, so what you are telling me

14  at this point in time is that based upon you and your agents'

15  assessment, he did not comply with being completely honest and

16  giving you complete information as relates to this event, so

17  you would say he has not lived up.

18         MR. OAKLEY:  Your Honor, he has hedged.  He has not

19  provided complete and accurate testimony as required by the

20  entirety of the plea at the discretion of the United States.

21  We have tried to get to the truth, and some of what he said

22  just simply continues not to make sense.

23         THE COURT:  Okay.

24         MR. KELLER:  Your Honor --

25         THE COURT:  Yeah.  How do you respond to that?

1          MR. KELLER:  Mr. Oakley can correct me if I'm in

2    error, but Mr. Link and I went to a meeting with the U.S.

3    Attorneys where both agents were present that are in court

4    today.

5          THE COURT:  Right.

6          MR. KELLER:  Mr. Oakley was there, and Ms. Glatfelter

7    was there.  I don't know the exact date of that meeting, but I

8    believe it was at that meeting in the hall before we went in

9    to speak with them that Mr. Bias acknowledged to us that he

10   had, in fact, shared an earlier draft of a Statement of Facts

11   with Mr. Hillman.  And that was -- well, came as a total

12   surprise to Mr. Link and I, but Mr. Bias did make that

13   disclosure.  And I believe then that it was discussed with the

14   government parties at that conference which was all part and

15   parcel of preparation for trial and Mr. Bias' testimony.

16      And so all of that was known as to how it all changed -- I

17   think that's a little fuzzy.  There was no proffer that had

18   proceeded any of that, to my knowledge.

19          MR. LINK:  Your Honor, I would add that, of course,

20   our ethical obligations would prohibit us from sharing

21   anything --

22          THE COURT:  I get that.

23          MR. LINK:  -- without Mr. Bias' permission.  It was

24   up to Mr. Bias that instructed us to let them know about his

25   conversations with Mr. Hillman in an effort to be forthright.

1        THE COURT:  In any event, do you agree with the

2   language in the Plea Agreement that says after investigation

3   and review the Court may determine the offense factors and

4   recommendations are not appropriate and do not have to accept

5   such, and in that event he does not have the right to withdraw

6   his plea?  So do you agree the ball is back in my court no

7   matter which way I go on this?

8        MR. LINK:  I do agree, Your Honor.

9        THE COURT:  Okay.  Is there anything else we need to

10   talk about at this time?

11        MR. OAKLEY:  Your Honor, I thought I was clear, but I

12   do agree with Mr. Keller:  they did bring it to our attention.

13        THE COURT:  Okay.

14        MR. OAKLEY:  I would also note that, again, the

15   Statement of Facts was changed at the time of the plea taking

16   out Mr. Dahlsten's conversations, that the agent spoke to

17   Mr. Dahlsten and Mr. Bias about the lack of a license for

18   Dr. Dahlsten to write the prescription.  That was taken out.

19   And I believe that was another meeting with Mr. Hillman.

20        MR. LINK:  And as to that, Your Honor, it's

21   interesting that that point is brought up because although I

22   wasn't here for that plea colloquy, I have read the

23   transcripts.  Mr. Bias objected on the basis that he didn't

24   know Dahlsten's license was expired.  Now, of course, what

25   happened is the DEA contacted the clinic and informed Mr. Bias

1    that, in fact, Dr. Dahlsten's license had expired.

2        Mr. Bias still has a difficulty understanding that that

3    gives him actual knowledge, that the DEA calling and letting

4    him know that a license, a DEA license was expired gives rise

5    to actual knowledge on his behalf.  It's these semantic issues

6    that suggest Mr. Bias' lack of sophistication.

7        I mean, what's happening here is that Mr. Bias simply

8    isn't as sophisticated as the government would make him out to

9    be.  While that makes him no less culpable for the conduct at

10   issue, it certainly makes him no less cooperative either.

11       I understand that a conspiracy knowledge is imputed to all

12   the participants and they can be held accountable even for

13   things that they didn't actually know about, but to say that

14   he didn't cooperate because he was unable to elucidate things

15   that he doesn't actually have knowledge of is --

16           MR. KELLER:  Judge, unrelated to this case, one other

17   issue.  I was contacted through Mr. Oakley by an agent in

18   Kentucky, an Agent Dalrymple, who was conducting an

19   independent investigation, the nature of which I don't fully

20   know.  But in an effort to continue to cooperate, and this is,

21   I believe, after the trial, we did meet and had a video

22   conference with two agents in Kentucky, two DEA agents.  I'm

23   just suggesting to the Court that there was a continuing

24   cooperation.

25           THE COURT:  But nobody is asking for a 5K.

1    MR. OAKLEY:  I was contacted by an Agent Dalrymple.

2 I put him in contact with Mr. Keller.  I have not heard since

3 then of anything that was done or is going to be done.  I have

4 no idea of what has happened with that investigation.

5    MR. KELLER:  Judge, nor do I.  I just want the Court

6 to be aware that he did, again, cooperate.

7    THE COURT:  Okay.  I understand.

8    All right.  So here's where I am on this.  I'm going to

9 sustain at this time the total offense level of 37 and

10 Criminal History Category of II.  However, in terms of a

11 variance, I'm going to consider my discussion with Mr. Bias in

12 the Plea Agreement regarding a 34 as well as my discussion

13 with the suggested cap.  I'm not at this time saying exactly

14 where that comes out, but that will be taken into

15 consideration before the pronouncement of sentence.

16    So does anybody think they have to clarify anything on the

17 record before we move forward?

18    MR. OAKLEY:  The only other thing I guess I would

19 add, Your Honor, is the discussion about Mr. Journey, the

20 guidelines for the same calculations.  Mr. Journey did

21 multiple things in multiple cases and also had serious medical

22 issues and received the sentence recommended by the United

23 States.  It has no bearing on what Mr. Bias did as far as his

24 conduct with the United States.

25    THE COURT:  I'm not sure I completely agree with

1   that, Tim, because I think I do look at other similarly

2   situated defendants and try to find out how they are similarly

3   they are situated.  For both sides I will consider

4   Mr. Journey's ultimate sentence at arriving at a sentence in

5   this case because I have thought about that before.

6       All right.  Other than what we've already talked about, is

7   there anything in the PSI that's disputed by defendants?

8           MR. LINK:  No, Your Honor.

9           THE COURT:  Tim?

10           MR. OAKLEY:  No, Your Honor.

11           THE COURT:  All right.  That being the case, I'm

12   going to adopt the findings of fact as contained in the PSI as

13   my own, of course with the limitation on the death.  I'm not

14   going to involve myself in that.

15       So I find that the defendant has entered a valid plea to

16   Count One of the Superseding Indictment, which is a violation

17   of 21 U.S.C. 841(a)(1).  He's exposed to 20 years'

18   imprisonment, a million-dollar fine, at least three years on

19   supervised release and up to life if possible, and a

20   one-hundred-dollar special assessment.  We have already talked

21   about where the calculations would lead us in this case.

22       Before we move into the actual discussion with the

23   defendant and counsel and the government, is there anything

24   anybody else needs to place of record at this time as to

25   objections or whatever you think you need to make for the

1   Court of Appeals record?  Either side.

2         MR. LINK:  Solely, Your Honor, that we would request

3   further reductions from the sentencing level in this case due

4   to Mr. Bias' own health conditions.

5         THE COURT:  Well, we'll talk about that in just a

6   second.  I'm talking about the actual reports and the

7   statutory sentences as to calculations.

8         MR. LINK:  No, Your Honor.

9         THE COURT:  Mr. Oakley, anything?

10         MR. OAKLEY:  No, sir.

11         THE COURT:  That being the case, guys, do you have

12   anything you wish to say in anticipation of the sentence or

13   mitigation of the sentence, and does Mr. Bias wish to say

14   anything at this time?

15         MR. LINK:  Your Honor, I believe that we've covered

16   most everything already.  I would go back to the sentence

17   disparity in this case between the proposed sentence and that

18   of Mr. Journey.  Again, this was a model that Mr. Journey had

19   had in place at other clinics in the area working with his

20   brother, David Michael Journey.  This is a business model that

21   he brought to Mr. Bias' attention and solicited Mr. Bias'

22   participation.  It was Mr. Journey who was sponsoring patients

23   not only at these clinics but at other clinics in the area,

24   and he's gotten five years.

25     We are asking, Your Honor, that the government would

1    further reduce the level possibly from a 34 all the way down

2    to a 30 due to Mr. Bias' failing health, what we believe to be

3    his overstated criminal history, and the assistance he has

4    given to the government.

5        In the alternative, Your Honor, we'd asked for a downward

6    departure from the guidelines as to impose a sentence of no

7    more than ten years.  That was contemplated by the Plea

8    Agreement and, again, that would be twice that of what was

9    given to Mr. Journey.

10           THE COURT:  Since you mentioned health, the Probation

11   Department's addendum indicates he does have chronic back

12   pain, I guess from the neck injury, back and neck injury.  He

13   has high blood pressure.  He has an abscess that's being

14   treated, and I don't know exactly what the status of that is

15   now.

16       It does seems like that would be something that will be

17   cleared up just with due course; right?

18           MR. LINK:  Yes.  And that is an addendum to what was

19   actually contained in the presentence investigation report

20   itself.

21       In the presentence investigation report, it goes into a

22   little more detail about his medical issues.  There is mention

23   of the surgery to remove the abscess at the base of his spine.

24   He previously suffered a crushed pelvis and hip which gives

25   him chronic pain conditions and necessitates the use of a cane

1  while he walks.  He also has chronic high blood pressure; high

2  cholesterol; bleeding in his spine that the doctor believes

3  may be cancer; and I'm sorry for saying this in open court,

4  but a knot between his scrotum and his rectum that needs to be

5  evaluated; a 61 percent blockage of the left side of his

6  heart; Class 3-4 angina; and a partially reversible defect in

7  the interior wall of his heart for which a cardiac

8  catheterization has been recommended.

9          THE COURT:  I mean, at some point he was supposed to

10 take some medication for the heart issues, but he just doesn't

11 do it.

12         MR. LINK:  Well, he has very limited assets, Your

13 Honor, and no health insurance.  He has had a hard time coming

14 up with the money to get the medications recommended.

15         THE COURT:  Okay.

16    John, is there anything you want to say?

17         MR. KELLER:  Nothing further, Your Honor.  I believe

18 it has been covered.

19         THE COURT:  Tracy, now is your opportunity to tell me

20 anything that you think I should know before I hear from the

21 government.

22         THE DEFENDANT:  Well, Your Honor, I'm very sorry that

23 I ever got into this mess to start with.  I do hate what has

24 happened, not just because I'm in trouble but I do hate what

25 it has done to other people, other families.  And words cannot

 1  change it, but I would just like for you to know that I am

 2  sorry.

 3          MR. LINK:  Your Honor, I'd like to add one thing

 4  about Steve Hillman.  As everyone is aware in this case,

 5  Mr. Bias and Mr. Journey did enlist the services of Attorney

 6  Steven Hillman in this case early on in the life of these

 7  clinics.

 8      Now, if I may say so, any attorney worth his salt would

 9  have told Mr. Bias, as a nonphysician and with a criminal

10  history, to stay away from this, just get away from it.

11  Unfortunately, that's not the advice he was given.

12  Mr. Hillman did seize the opportunity and instead got himself

13  a $10,000-a-month retainer to advise Mr. Bias in how to skirt

14  and essentially evade the law.  Mr. Bias understood it to be

15  how to comply with the law, but while some attorneys will

16  advise their clients in an abundance of caution, there are

17  those that would basically advise them how to do things they

18  shouldn't be doing.

19      These clinics did generate money, and it was more money

20  than Mr. Bias had ever seen in his life.  Unfortunately, the

21  allure of that money did cause Mr. Bias to do some stupid

22  things.  As he's said to the Court here, he is aware of the

23  stupid decisions that he has made.

24      Unfortunately, he had surrounded himself with the likes of

25  Mr. Journey and Mr. Hillman who had their own interests in

1     mind, if I may say so.

2             THE COURT:  Anything else, guys?

3       Okay.  On behalf of the government, Mr. Oakley?

4             MR. OAKLEY:  Yes, sir.  Thank you.

5       First, Your Honor, I know it's fashionable to blame other

6   people who are not seated at the defense table, that somehow

7   it's their fault for his actions.  But Mr. Bias was traveling

8   before he opened up this clinic to Florida to obtain pills, to

9   sell pills, was sponsoring people to obtain pills and sell

10  those pills.  So to now be upset that what his actions have

11  contributed to in Southern Ohio, Your Honor, I would hope

12  would fall on a deaf ear.

13      Like I said, he started this clinic fairly late in what

14  we've called a pill tsunami that just devastated Southern

15  Ohio, and Scioto County in particular, where people were dying

16  on a daily basis due to opiate addiction and overdose.  He got

17  into this at a time where the United States has already

18  prosecuted a number of clinics, a number of doctors, already

19  conducted a number of search warrants.  So the pill problem

20  obviously was not new in Portsmouth and obviously was known to

21  Mr. Bias because he was traveling at great lengths, despite

22  his physical ailments, to obtain and sell narcotics.

23      So to blame Mr. Journey now for that, Your Honor, I think

24  is not quite accurate.  Mr. Bias was more than a willing

25  participant and more than a willing gatherer of the cash that

1    was generated.  We have estimated, Your Honor, in a

2    preliminary forfeiture, of approximately $6.7 million that was

3    illegally generated by Mr. Bias and Mr. Journey.

4         Their sentence that was recommended before the departures

5    was similar.  They were sentenced to roughly the same

6    guideline range.  Mr. Journey testified in Mr. Hillman's case,

7    as did Mr. Bias.  They also testified in the Sadler matter.

8         The Court is aware of Mr. Journey's serious ailments that

9    are currently being handled by the Bureau of Prisons.  The

10   same with Mr. Bias:  what he has can be handled by the Bureau

11   of Prisons.  So it does not warrant a downward departure based

12   on his physical health.

13        Now, as to Mr. Hillman, we'd love to get to the truth of

14   what actually was going on.

15        We would note that at trial Mr. Bias, due to the lateness

16   of the operation in the area, local pharmacies were not

17   honoring his prescriptions or prescriptions that came from

18   these clinics.  So to get around that, Mr. Bias simply opened

19   up two unlicensed dispensaries, one in each place:  one on

20   Eleventh Street and one on Findlay.  He loaned Dr. Fantauzzi

21   $17,000 to begin a dispensary to subvert the need for outside

22   physicians to review these prescriptions.  Dr. Chong opened up

23   a dispensary, unlicensed, in the Eleventh Street clinic that

24   generated a large amount of cash.  Again, the purpose was to

25   subvert the need for an outside, unbiased, for lack of a

 1    better word, set of eyes on what was going on.  You couldn't

 2    stay in business without these dispensaries being open.

 3        When those were shut down, Your Honor, by law enforcement,

 4    Mr. Bias then engaged in a business transaction with

 5    Mr. Hillman, providing him approximately $220,000 in cash,

 6    again secretly, for Mr. Hillman to open up or try to open up a

 7    pharmacy in Piketon, Ohio.  The Court has heard the testimony

 8    about that.  Piketon is a small town in the middle of Route

 9    23.

10        Oddly enough, that money wasn't even registered as any

11    type of loan.  We saw an unsigned promissory note for $138,000

12    that Mr. Bias gave to Mr. Hillman with no way to collect.

13        We also learned from the trial that another $75,000 in

14    cash was provided without any type of agreement, signed or

15    unsigned, that showed the dispensing of this cash.

16        So it's our opinion that the cash was meant to be hidden,

17    that it was hidden, and it was intended to open up a pharmacy

18    to allow Mr. Bias to stay in business distributing these pills

19    in this area affecting and killing individuals.

20        That's why we have recommended the sentence that we had.

21        I know the Court's concerns about guideline ranges.  To

22    Mr. Bias' credit, we did not have to exhaust resources with

23    him.  He did plea.  Like I said, we are concerned that he

24    hedged what he said.  Much of what he said didn't make sense

25    when you look at the facts and the testimony of the other

1    witnesses.

2        But, Your Honor, you know, he was not a lamb led into the

3    slaughter by Mr. Journey.  He was well aware of what was going

4    on and fought hard to stay in business despite the devastation

5    that was taking place in Southern Ohio, and we'd ask the Court

6    to sentence accordingly.

7              THE COURT:  Okay.  Anything else?

8        (No response.)

9              THE COURT:  All right.  Pursuant to 18 U.S.C.

10   3553(a)(4) and (a)(5), I have to impose a sentence which is

11   consistent, as I deem appropriate, with the guideline

12   imprisonment range and consistent with the possible sentences

13   in this case but also reflects the nature and circumstances of

14   this offense.

15       We've been through this a number of times, a number of

16   co-defendants, but the defendant's co-conspirators operated

17   these clinics that we talked about.  They dispensed

18   prescriptions for pain medication to persons who had no

19   medical need for it.  They were basically feeding addictions

20   of many hundreds of people.  The number of pills prescribed

21   were in the thousands, if not millions.  The defendant also

22   helped sponsor other people in terms of filling prescriptions

23   and setting up other clinics, and he did make the financial

24   investment that Mr. Oakley spoke about just a moment ago.

25       As mentioned by defense counsel, he was raking in

1    thousands of dollars, and he was exposing the community to

2    what has been described as an OxyContin plague in the Southern

3    District of Ohio, specifically in the general Portsmouth area,

4    so I have to take that into consideration.

5        In terms of his personal criminal history and

6    characteristics, for a drug dealer of this magnitude they are

7    not that significant.  There are some brushes with the law and

8    a couple of various deals in Kentucky and on this side of the

9    river.  However, he has had prior involvement with marijuana.

10   He is no stranger to the illegal side of life, but he is not

11   as severe as demonstrated by the Roman numeral characteristic

12   II that comes with that.

13       So the sentence that I have to impose has to promote

14   respect for the law and provide just punishment.

15       Mr. Journey and Mr. Bias each showed absolute disrespect

16   for the law and, in fact, I think have demonstrated over a

17   period of time that they thought they were above it at other

18   times.  So I have to impose a sentence which provides adequate

19   criminal deterrence and protects the public from potential

20   future endeavors.  Both individuals have demonstrated

21   unwillingness to disengage in criminal activity.

22       I am troubled by several things.  One is the disparity in

23   sentencing between Mr. Journey and Mr. Bias, so I'm going to

24   take that into consideration.  The other is the plea colloquy

25   where I discussed Level 34, and also we discussed the

1    potential cap of ten years.  But I believe I've made it clear

2    in the situation that, consistent with the terms of Plea

3    Agreement, I am not bound to follow either of those two

4    recommendations if, in fact, the facts and evidence bear out

5    not following those.

6        I watched Mr. Journey testify.  I watched Mr. Bias

7    testify.  I was not impressed by either one of those gentlemen

8    in terms of their candor on the witness stand.

9        So I am taking all of those facts into consideration.

10       I'm going to impose a sentence of 168 months in the Bureau

11   of Prisons.

12       There is going to be a fine.  Depending on how counsel

13   feels, I have had defense counsel at different times believe

14   that a fine has assisted in terms of placement in a prison or

15   potential employment opportunities; I have had other defense

16   counsel indicate that a fine has not been helpful to their

17   incarcerated clients.  In the past what I have done is impose

18   a small fine and then indicated to counsel that if it ends up

19   backfiring, you can file a motion and I will obviate it at a

20   later date.

21       But I will leave it up to you guys whether or not a fine

22   would be helpful or not.  I don't know if you know.

23           MR. KELLER:  In all fairness, I don't know that I can

24   answer that.

25           THE COURT:  All right.  What I'm going to do then,

1    I'm going to impose a fine of $2500.  If, in fact, that

2    becomes a hindrance on the prison account or does not help him

3    in terms of inside-institution employment opportunities, he

4    can contact you guys, file a motion, and I'll waive the fine.

5        The fine will be paid at $25 a quarter while he's

6    incarcerated if he's working in a non-UNICOR or Grade Five

7    job, and up to 50 percent if he's working in a One to Four

8    job.

9        If there is an unpaid balance at the time of his release,

10   I'm not going to schedule a payment.  I'll waive it at that

11   time so any unpaid balance will be taken care of.

12       All right.  The recommended term of supervised release is

13   three years.  Consistent with Mr. Bias and Mr. Journey's

14   predilections for not complying with the law, I'm going to

15   make a term of supervised release in this case of ten years.

16       He is to report upon his release within 72 hours to the

17   Probation Department in the district within which he intends

18   to reside.

19       He will be given the standard terms and conditions of

20   probation, which are basically the same as they are for

21   supervised release, including not comitting any federal, state

22   or local crimes.

23       He's prohibited, not only during the term of supervised

24   release but from here on out, from possessing, owning or using

25   a firearm or dangerous ordnance.

1    Obviously he's not to be involved in illegal controlled

2  substances.  There will be drug-testing in 15 days and at

3  least two tests thereafter.  There is some history of alcohol

4  abuse.  If the Probation Department determines that an alcohol

5  or drug assessment is appropriate, he will comply with

6  whatever they ask him to do and will follow whatever

7  recommendations they make in that department.

8    The one-hundred-dollar special assessment is owing and

9  due, as is the collection of a DNA sample.

10    Forfeiture pursuant to 18 U.S.C. 853 is also granted.

11         MR. LINK:  Your Honor --

12         THE COURT:  Barb, you got anything?

13         COURTROOM DEPUTY:  There was a recommendation for

14  some mental health treatment.

15         THE COURT:  I think that goes with the alcohol

16  counseling.  So if the Probation Department feels he needs

17  some mental health and alcohol counseling, he will deal with

18  that based upon their recommendation at the time.

19    Anything else?

20         COURTROOM DEPUTY:  And can you just confirm again

21  what the supervised release term is?

22         THE COURT:  Ten years.

23         COURTROOM DEPUTY:  Ten years.  All right.

24         THE COURT:  Anything else, counsel?

25         MR. LINK:  Your Honor, I'd like to have a moment to

1   address the order of forfeiture, if we might?

2           THE COURT:  Sure.

3           MR. LINK:  Your Honor, the government -- I believe

4   Mr. Oakley misspoke when he mentioned $6.7 million allegedly

5   generated by this business.  What the order has asked for is

6   $6,348,000.00, I believe, and that estimate has been obtained

7   by essentially making a hypothetical estimate of revenues.

8   They are estimating for two clinics 30 patients a day, five

9   days a week at $200 a patient.

10          THE COURT:  Let me ask you this, Tim.  Have you guys

11  filed the preliminary forfeiture order yet or not?

12          MR. OAKLEY:  Yes, we have.  It's been signed by the

13  Court.

14          THE COURT:  Go ahead.  Sorry.

15          MR. LINK:  It's quite all right, Your Honor.

16      However, even assuming, without disputing any of the

17  numbers, the 30 patients a day or $200 a patient, that number

18  would represent the gross proceeds of this business.  Now,

19  from those gross proceeds, of course, each of the doctors were

20  paid at a base salary of $26,000 per month.  All of the

21  employees of the clinic were paid.  None of that money is

22  being disgorged.  The clinics were both paying rents, their

23  utilities, their supplies and, of course, the $10,000 a month

24  that was given to Mr. Hillman.  Then the net proceeds of those

25  proceeds were split 50/50 between Mr. Bias and Mr. Journey.

```
 1        I've actually prepared, if I may, Your Honor --

 2            THE COURT:  Sure.

 3            MR. LINK:  -- just a brief --

 4            THE COURT:  Just hand a copy over to Mr. Oakley.

 5            MR. LINK:  Of course.

 6    -- a brief selection with some of my own rough math, again

 7   using the numbers provided by the government as far as the

 8   months, the duration each of these clinics were opened.  The

 9   salary calculation is actually taken from the motion for

10   forfeiture on Dr. Chong.

11            THE COURT:  Let me ask you this.  Tim, has the

12   government started the levy against any of this yet?

13            MR. OAKLEY:  We have.  I think there is --

14            THE COURT:  Have or have not?

15            MR. OAKLEY:  We have.  I think there is an action

16   against the 43,000 in the vehicle.

17            THE COURT:  Oh, that was the issue we went through

18   with Hillman; right?

19            MR. OAKLEY:  Yes.

20            THE COURT:  Um, let's do this.  Other than that,

21   let's give counsel 30 days to put together a motion in

22   opposition to the forfeiture amount calculated, and then we

23   can deal with that.  Is that okay?

24            MR. OAKLEY:  That's fine.

25            THE COURT:  All right.  So is that okay, guys, 30
```

1    days?

2           MR. LINK:  Yes, it is, Your Honor.

3           THE COURT:  Okay.  Now we've got a couple of

4    questions in terms of two issues:  one is self-surrender and

5    the other is location.  Anything to be heard on that?

6           MR. KELLER:  Judge, with regard to the first, we

7    would ask for self-surrender and just indicate to the Court

8    that he has been on pretrial release for an extended period of

9    time.  To my knowledge, there have been no issues that have

10   been brought to the Court as to noncompliance with all of the

11   requirements that he has had.  So at this point I would just

12   ask the Court to allow the self-surrender in light of that

13   representation.

14          THE COURT:  Keith, you're in the back; right?  Is

15   there any issues in terms of his compliance in terms of

16   conditions of release at this point in time?

17          OFFICER MANFRA:  Your Honor, we've had no issues with

18   Mr. Bias.  He has complied with everything we have directed

19   him to do.  Pretrial does have some concern about the elevated

20   risk with the amount of time that he has been given.

21          THE COURT:  Okay.  Has he been on EMU or anything

22   like that?

23          OFFICER MANFRA:  He was on a GPS unit --

24          THE COURT:  Starting out.

25          OFFICER MANFRA:  -- supervision and was taken off of

1    that with his compliance.

2              THE COURT:  Okay.  I'm thinking maybe if we do a

3    self-surrender we could reinstitute the EMU during that period

4    of time, or would that be a problem?

5              MR. OAKLEY:  Your Hoor, we would -- if the Court is

6    entertaining a self-surrender, we would oppose it for multiple

7    reasons.

8         One, there is no guide right now on Mr. Bias because that

9    has been removed.

10        There is also a substantial amount of assets that are

11   unaccounted for.  Even using Mr. Link's amounts, which I don't

12   believe are complete, there's almost $2 million out there that

13   we've never found.  He has the assets.  He has been living in

14   other states with other driver's licenses.

15        We would ask that he be detained now.  Failing that, we

16   would ask that he be placed on electronic monitoring with a

17   curfew, that there is no need for him to be traveling around.

18             THE COURT:  I'm trying to -- this goes back.  Refresh

19   -- didn't we have a problem with electronic monitoring before?

20   Weren't there some violations way back when, or am I thinking

21   of someone else?

22             OFFICER MANFRA:  Your Honor, I'm not aware of any

23   violations of any location monitoring before when he was on

24   that.  He was on a GPS unit.  I do not believe they have a

25   home phone line at the residence, so it would take a day for

1    us to get the equipment.

2            THE COURT:  What's the situation on the multiple

3    driver's license?

4            MR. OAKLEY:  He had a Florida driver's license while

5    he was living up here.  I don't want to misstate, but I

6    believe they had a condominium.

7            MR. LINK:  Not that it amounts to anything, Your

8    Honor, but it was actually just a Florida state identification

9    card.  It doesn't amount to a hill of beans.

10           MR. OAKLEY:  Well, it amounts to fraud if he wasn't

11   there.

12           MR. LINK:  Same thing one way or the other.  It's an

13   out of state --

14           THE COURT:  Guys, this is about whether or not he can

15   be trusted to show up for his term of incarceration, which

16   normally takes about 45 to 60 days to get a location.  Do you

17   have anything on the location itself?  Close to home or --

18           MR. KELLER:  Judge, I would want it to be close to

19   home.  He has multiple family members that are here and have

20   been supportive.  And there are -- in spite of what Mr. Oakley

21   is representing, as far as we know Mr. Bias has limited

22   sources of income and, quite frankly, has put himself at risk

23   medically by putting off surgeries that we talked about when

24   we first met him and it was a problem, and only in the recent

25   past did he have that surgery.  I think he's allowed himself

1   to deteriorate.  I don't believe he is suicidal.  I think he's

2   just made a decision because of finances, and I think he has

3   shown himself to be reliable to the extent that he has fully

4   complied, he's always come to our office, he's always

5   contacted us, and he's been to every court proceeding.  As

6   Mr. Manfra says, there is no reason to suspect that that

7   wouldn't be the same.

8           THE COURT:  Well, I mean, things do change.

9       Keith, how long -- do you need Mr. Bias to organize

10  whatever you've got, the GPS?

11          OFFICER MANFRA:  It would not require him to do

12  anything.  We would just have to get the equipment in by our

13  provider.

14          THE COURT:  How long will that take?

15          OFFICER MANFRA:  I can have it by tomorrow.

16          THE COURT:  Okay.

17      I'm going to hold him overnight.  All right?  When Keith

18  tells me that he's got the mechanical stuff ready to go, then

19  I'll release Mr. Bias.  I don't want him untethered because of

20  the significant sentence he's facing.  So when Keith reports

21  that he is good to go, that will be the deal.

22      Does that work with you, Keith?

23          OFFICER MANFRA:  Yes, Your Honor.

24          THE COURT:  And you can make the restrictions as

25  tight as you want:  curfew; whatever; not leave the residence.

```
 1    Anything you want to do, make sure you've got him bundled up.

 2    All right?

 3            OFFICER MANFRA:  Okay, Your Honor.

 4            THE COURT:  Is that okay?

 5            OFFICER MANFRA:  Thank you.

 6            THE COURT:  You're welcome.

 7            The objection would be noted.

 8            MR. LINK:  Thank you.

 9            THE COURT:  Anything else at this time?

10            MR. OAKLEY:  Not from the United States, Your Honor.

11            COURTROOM DEPUTY:  We do have one thing --

12            THE COURT:  Well, we can deal with the dismissal.

13            MR. OAKLEY:  We'll prepare the dismissal.

14            THE COURT:  I'll get to the notice of appeal.

15        But Tracy, is there anything you want to say?

16        Yes, sir?

17            OFFICER MANFRA:  Your Honor, they did make me aware

18    that they did have a home phone line installed at the house --

19            THE COURT:  Okay.

20            OFFICER MANFRA:  -- which we could use our base unit

21    which would just monitor him in the house.  We can probably do

22    that today upstairs.  But that would not monitor anywhere

23    else.

24            MR. OAKLEY:  He could stay on house arrest, Your

25    Honor.
```

1         THE COURT:  So obviously he'd have to be on house

2  arrest until other arrangements can be made or some kind of --

3         OFFICER MANFRA:  Correct, Your Honor.

4         THE COURT:  I'm okay with that.  As long as you're

5  satisfied that you can make conditions sufficient that you've

6  got an eye on him, I'm okay with that.

7         OFFICER MANFRA:  Okay.

8         THE COURT:  Is that all right then?

9         OFFICER MANFRA:  Yes, Your Honor.

10        THE COURT:  All right.  Should he be free to go now?

11  Should we hold him for a period of time?

12        OFFICER MANFRA:  As long as I can verify the phone

13  line here, as soon as -- now I can go get the phone number,

14  verify the phone line and have that done here shortly.  Then I

15  would know if he would be ready to go on the monitoring.  As

16  of right now, I'm taking the word of his girlfriend that a

17  phone line is working and in place.

18        MR. LINK:  Mr. Bias has represented the same to me,

19  Your Honor.

20        THE COURT:  Yeah, I'm sure, but I'd like to check it

21  out.

22    Do you want to give me a ballpark, Keith?  I mean, I hate

23  to put you on the spot.

24        OFFICER MANFRA:  I can find out within 15 minutes.

25        THE COURT:  Okay.  Well, why don't we -- after I go

```
 1   through the rights of appeal and all that stuff, we'll just

 2   ask Mr. Bias and his lawyers to stay in the courtroom for a

 3   few minutes while we take care of other matters.

 4             MR. KELLER:  Judge, that's perfectly all right.

 5             THE COURT:  All right.

 6             OFFICER MANFRA:  Just a point of clarification, Your

 7   Honor?

 8             THE COURT:  Yes, sir.

 9             OFFICER MANFRA:  Would we like to keep him on that

10   type of monitoring permanently until he surrenders or would we

11   like to move him to the GPS unit once the equipment comes in?

12             THE COURT:  I'm thinking the house arrest concept is

13   probably the smartest for the time being, and then you guys

14   can talk with Tracy.  If there's some reason that it's not

15   working, we can make an adjustment.  But I think if he's home

16   with his family, that's better than being in the hoosegow;

17   right?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  Let's start off with that and see where

20   it goes.

21             OFFICER MANFRA:  Okay, Your Honor.

22             MR. LINK:  Thank you, Your Honor.

23             THE COURT:  Tim, before I do the appeal, anything

24   else?

25             MR. OAKLEY:  No, sir.
```

1          THE COURT:  Anything else before I advise him of his

2     rights to appeal?

3          MR. KELLER:  No, Your Honor.

4          MR. LINK:  No.

5          THE COURT:  Mr. Bias, both sides have the right to

6     appeal the sentence that I've just pronounced, not just you

7     but also Mr. Oakley.

8        You have two options.  Number one, as you sit here today,

9     if you say, "Judge, I'm not happy with the sentence and I know

10    I want to appeal it," then Barb will start the paperwork to

11    get that underway.  If you want to consult with your counsel,

12    see what it all means, decide which way to go, then you've got

13    14 days from the date the entry goes on, which will probably

14    be -- probably not this afternoon but probably this tomorrow.

15       So I'll ask you and your lawyers:  As you sit here today,

16    do you know if you wish to appeal the sentence or do you wish

17    a few days to think it over?

18         THE DEFENDANT:  I'd like to talk to my attorneys,

19    Your Honor.

20         THE COURT:  Okay.

21       Counsel, if Mr. Bias indicates that he wants to appeal the

22    sentence, will you protect his interests in that regard and

23    make sure everything is filed in a timely fashion?

24         MR. LINK:  We certainly will, Your Honor.

25         THE COURT:  All right.  So how do we want to handle

```
 1    -- do we need to have a hearing on their response on the
 2    forfeiture?
 3            MR. OAKLEY:  What I would do is, I would ask the
 4    Court to set it for a hearing.  We'll have someone in the
 5    office -- I think Karen Moss is working on the forfeiture.
 6            THE COURT:  Why don't we set that before Mr. Bias'
 7    surrender date so he can be here?  So if you guys need 30 days
 8    to file a motion, could we -- I think we would be safe doing
 9    it within ten days.
10        Tim, how much time do you need?  You'll have your facts
11    organized; right?
12            MR. OAKLEY:  Yes, sir.
13            THE COURT:  So if we set a hearing date, a hard
14    hearing date, say, 40 days out?
15            MR. OAKLEY:  Your Honor, I think that would be fine.
16    I'll talk to Miss Moss to clarify.  If there's an issue, I'll
17    call the Court.
18            THE COURT:  Is that okay, guys?
19            MR. KELLER:  That's fine, Your Honor.
20            MR. LINK:  Yes, Your Honor.
21            THE COURT:  Barb, you want to go out about 40 days
22    for a hearing date?
23            COURTROOM DEPUTY:  I'm looking at possibly -- can you
24    do July 15th, which is a Tuesday?  We can do three o'clock in
25    the afternoon.
```

1              MR. OAKLEY:  That's fine with the United States.

2              MR. LINK:  What was the time, Miss Crum?

3              COURTROOM DEPUTY:  Three p.m.

4              THE COURT:  Then do me a favor.  If you guys think

5    we're getting into any kind of evidentiary presentation,

6    notify the Court and we'll try to move the time up.  Okay?

7              MR. LINK:  Certainly, Your Honor.

8              THE COURT:  Do you have a response already?

9              OFFICER MANFRA:  Not yet, Your Honor.  I have to

10   speak with Mr. Bias.

11             THE COURT:  Okay.  Fine.

12      So Tracy, if you're released, it's under the terms and

13   conditions we just spoke about, basically house arrest with

14   the telephone monitoring and lockdown-type situation.  All

15   other terms of the former pretrial release will remain in full

16   force and effect until you get a designation.  You'll get

17   notification from the Bureau of Prisons of when and where to

18   be.  You have to be there at that time; otherwise, that's a

19   violation of bond and subject to a whole new line of offenses.

20   All right?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  In the meantime, you'll figure out

23   whether or not you want to appeal.  We'll also have the

24   forfeiture hearing.  Mr. Bias will be present if his presence

25   is needed.

1      Anything else?

2           MR. OAKLEY:  No, sir.

3           THE COURT:  Yeah, Barb?

4           COURTROOM DEPUTY:  Should we put in the Judgment and

5      Commitment order the -- at least a date beyond July 15th just

6      in case --

7           THE COURT:  That's okay.  So we'll treat it either as

8      a stay until that date or -- yeah, yeah, exactly.  We'll cover

9      that.

10          COURTROOM DEPUTY:  Okay.

11          THE COURT:  All right.  Anything else on the record

12     of any kind?

13          MR. KELLER:  Nothing further, Your Honor.

14          THE COURT:  Okay.  Any objections -- I think for

15     Court of Appeals purposes you guys should preserve any

16     objections you think need to be made as to the sentence

17     imposed.  So I don't know who wants to handle that.  I think

18     you have to restate with some particularity what you've

19     already said, unfortunately.

20        So who wants to handle that?

21          MR. LINK:  Thank you, Your Honor.

22          THE COURT:  Yes.

23          MR. LINK:  For the record, we would -- acknowledging

24     that the Court has sentenced him within the guideline levels

25     to a Level 34, if I'm not mistaken, we would object as to the

1    government's allowed breach of the Plea Agreement, what we see

2    as a breach of the Plea Agreement.

3        It is our position that, under the Plea Agreement, the

4    government was required to move to withdraw Mr. Bias' plea in

5    the event that he didn't cooperate or request no more than ten

6    years in the event that he did cooperate.  One way or the

7    other, the government was required to act.  It did not file a

8    Motion to Withdraw his plea, instead took his testimony and

9    put him on the stand in open court.

10       We would say at this point the egg can't be unscrambled,

11   would have to essentially -- the government would be bound to

12   comply with their obligations, and we would request a term of

13   no more than ten years.

14           THE COURT:  Tim, I don't know if you need to respond

15   at this time or not.

16           MR. OAKLEY:  Your Honor, if we could, I guess I'm

17   kind of -- I'm a little confused that, again, the objection is

18   not an objection to the guideline range but the United States

19   not taking away the acceptance and going to trial, which would

20   only hinder Mr. Bias considering the entirety of the plea.

21   The Court has sentenced Mr. Bias to a level of time lower than

22   what the guideline recommendation was.  I don't consider the

23   United States in breach.  If anyone breached their obligation,

24   it was Mr. Bias.

25       But, you know, to claim now that the United States was

1    obligated to take away any benefit that Mr. Bias received by

2    his admissions, in part, to what he did seems to be a little

3    absurd.  But if that's the case, the United States would just

4    simply remove -- we've got seven days.  If the Court would

5    want us to file a Motion to Withdraw the plea, go to trial

6    with the statements admitted as per the entire Plea Agreement

7    -- that's our contract -- we would be willing to do that too.

8            THE COURT:  I think I've already made my position

9    clear on the record that that's not necessary.  The government

10    says that even if they dispute Mr. Bias' honest and complete

11    testimony, it does not entitle him to withdraw his plea once

12    it's entered.  He has entered that plea.

13        The government has disputed the honesty and completeness

14    of his testimony, which I think under paragraph 16 kicks

15    everything back to me where Mr. Bias acknowledged at the time

16    of the plea that I am permitted to look at all the offense

17    factors, the recommendations and decide what is appropriate

18    and what is not appropriate.

19        In any event, I don't think that measure is necessary.  As

20    I've already indicated, I think the government made its

21    position in terms of cooperation known in a Sentencing

22    Memorandum which is essentially a motion, I guess.  I mean, I

23    treat it as a motion of noncompliance.

24        So I think we've covered the record in that regard.

25            MR. KELLER:  Judge, if I may?  One other issue that

1    Mr. Link didn't bring up is with regard to the disparity.  I

2    don't know what Bart Journey's criminal history is.

3              THE COURT:  It was worse.

4              MR. KELLER:  I assumed it was worse by his testimony

5    in an earlier trial --

6              THE COURT:  Yeah.

7              MR. KELLER:  -- but there's still the issue of

8    disparity.  The Court had shared with counsel earlier that the

9    Court was not impressed, and I don't want to misquote Your

10   Honor, with either Mr. Bias' testimony or Mr. Journey's

11   testimony.  So it just seems that they're on equal footing, so

12   to speak, with a criminal history that's worse for

13   Mr. Journey.

14       And we could argue about the severity of the mental -- or

15   the physical conditions.  I don't want to get into that, but

16   it's still almost a threefold increase.

17       So I would just leave it at that.

18             THE COURT:  Well, I thought I was clear on that;

19   maybe I was not.  In arriving at the 168 months, I took into

20   consideration the paragraphs in the Plea Agreement as well as

21   the sentence I handed out to Mr. Journey.  So considering the

22   discussion of the 34, considering the discussion of the

23   possible cap, considering where Mr. Journey ended up and

24   Mr. Bias' involvement in this conspiracy as, frankly, the

25   principal, that's how I ended up where I did.  I did consider

1    all those factors.

2           MR. KELLER:  Thank you, Your Honor.

3           THE COURT:  Anything else?

4           MR. KELLER:  Nothing further, Judge.

5           THE COURT:  I'll ask you guys to just step in the

6    back until Keith is organized and he can report back.

7        Barb, what's is the next case, which one?

8           COURTROOM DEPUTY:  The next one is *U.S. versus Mark*

9    *Fantauzzi*.

10          THE COURT:  Well, Ransom is here.  Why don't we just

11   go straight into that?  I understand Mr. Fantauzzi is not

12   present; correct?

13          COURTROOM DEPUTY:  Correct.

14          THE COURT:  Where is Ransom?

15       Ransom, come on up.

16       Thank you, guys.

17          MR. LINK:  Thank you, Your Honor.

18          MR. KELLER:  Thank you.

19          THE COURT:  So that's the order of the Court, which I

20   guess I should say I consider it to be fair and reasonable in

21   light of the appropriate sentencing factors and discussions we

22   have had.

23       Okay.  Thank you.

24        (The proceedings concluded at 11:00 a.m.)

25

1       **C E R T I F I C A T E**

2

3       **I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM**

4   **THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.**

5

6   **S/MARYANN T. MAFFIA, RDR**

7   **Official Court Reporter**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25